UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FEDERAL INSURANCE COMPANY,
As subrogee of Kamax LP,

    Plaintiff,

v.

NANCY GUSMANO, CHRISTOPHER P.
HURTTGAM and CPH SORTING &
CONSULTING, INC.,

    Defendants.
    _____/

Case No. 04-72421

Honorable Patrick J. Duggan

## **OPINION**

On June 30, 2004, Plaintiff Federal Insurance Company filed a three-count complaint against Defendants in this Court alleging: (I) fraud/conversion, (II) Federal Racketeer and Corrupt Organizations (RICO) Act violations, and (III) constructive trust. Presently before this Court are Plaintiff's Motion for Summary Judgment on Count III, Constructive Trust and Defendants' Motion for Summary Judgment. The Court held a hearing on May 25, 2005.

**I.  Background**

A. Factual Background

Plaintiff Federal Insurance Company issued Kamax, L.P. a policy of employee dishonesty insurance. Federal Insurance paid Kamax $258,021.77 under this policy after Kamax discovered that Defendants were involved in an allegedly fraudulent scheme in which Defendant Nancy Gusmano had embezzled from Kamax.

Kamax manufactures various types of bolts which it supplies to automotive manufacturers. The automotive manufacturers require that bolts arriving at their assembly facilities are free of defects. If a company delivers defective bolts to a manufacturer, the manufacturer may require the bolts to be inspected by an outside third-party before delivery. For example, if a supplier shipped Daimler Chrysler defective bolts, Daimler Chrysler would place the supplier in "3rd Party Validation Activity" (3PVA) status, requiring third-party validation. Daimler Chrysler placed Kamax in 3PVA status.

CPH Sorting & Consulting ("CPH") and QualityMax are both third-party validation companies. Defendant Christopher Hurttgam was a co-owner of QualityMax and the sole owner of CPH.

Nancy Gusmano, Kamax's Director of Quality, and Hurttgam were former business associates and friends. On September 1, 2002, Gusmano approached Hurttgam in his capacity as owner of CPH and offered to pay him $25.00 per 1,000 parts. However, no pieces were actually sorted for Kamax. (Hurttgam Dep. at 62).

Defendants contend that there was no actual sort that was contracted for CPH to perform for Kamax. Gregory Sander, the President of Kamax, explained his understanding of the agreement as follows:

> Nancy had approached me and said Chris would come in and verify that our equipment was adequate and our equipment was considered state of the art . . . Nancy had advised me that Chris would review the sorting process, analyze the results of that sort, the defective parts that come out of it, then issue a report to Chrysler that he had validated those parts, but they were sorted inside of Kamax.

(Sander Dep. at 16).

Moreover, according to Hurttgam:

2

> Kamax wanted to use my company as a certified three PVA program and run parts through my company showing that they've been sorted, third party sorted and that I would have to be held liable for the sort. And so there was a level of risk I guess of liability because I'm not seeing the parts, I'm not really looking at them and that's when [sic] I was more or less up against from a financial aspect from my company and would be paid a portion which was at $25 a thousand approximately but Nancy would take care of all the documentation so.

(Hurttgam Dep. at 61-62).

Hurttgam admits that if one of the parts had actually failed, he probably would have told Chrysler that he looked at those parts but must have missed one. (Hurttgam Dep. at 124).

Gusmano prepared the CPH invoices which were then presented to the Kamax accounts payable department. The invoices list the service as "third party validation." (Gusmano Dep. Ex. 1). Gusmano picked up the checks and delivered them personally to Hurttgam. (Gusmano Dep. at 18). Kamax paid CPH over $268,000 based on these invoices. CPH was paid for 12,500,000 parts when only 5,000,000 parts were manufactured and shipped.

Within one month of their business agreement, Hurttgam gave Gusmano $139,000. Hurttgam contends that it was an interest-free loan. Hurttgam admits, however, that because of the "income that CPH received from Kamax," he was able to loan Gusmano the money. (Hurttgam Dep. at 81). Hurttgam admits that CPH as a corporation had no business interest in loaning money interest-free to Gusmano. (Hurttgam Dep. at 59-60).

In October 2003, Kamax's parent company discovered the arrangement and submitted a claim to Federal Insurance in the amount of $268,021.77. After the application of a $10,000 deductible, Federal Insurance paid Kamax $258,021.77 under the insurance policy.

  B.  <u>Procedural Background</u>

3

On June 30, 2004, Plaintiff Federal Insurance Company filed a three-count complaint against Defendants Gusmano, Hurttgam, and CPH seeking $258,021.77. On March 11, 2005, this Court entered a Stipulated Order of Dismissal dismissing Defendant Gusmano. On April 4, 2005, Defendants Hurttgam and CPH filed a Motion for Summary Judgment seeking judgment on all three counts of Plaintiff's complaint.[1] On April 4, 2005, Plaintiff filed a Motion for Summary Judgment On Count III–Constructive Trust seeking $268,000 or in the alternative, seeking $168,995 for the 7,500,000 parts for which Kamax was over-billed.

## II.   Standard of Review

This Court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists for trial unless, by viewing the evidence in a light most favorable to the nonmoving party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477

---

[1] Although Defendants' motion is titled "Motion for Summary Disposition," Defendants cite FED. R. CIV. P. 56(b), 12(b)(6), and 12(c) in support of their motion. (Mot. ¶ 1). Rule 12(c) and 12(b)(6) motions test the legal sufficiency of the plaintiff's complaint. *See Scheid v. Fanny Farmer Candy Shops Inc.*, 859 F.2d 434, 436 n.1 (6th Cir. 1988). When deciding the motions "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996). In light of this standard of review, the Court does not believe that Defendants are entitled to judgment for failure to state a claim upon which relief may be granted pursuant to 12(b)(6) or for judgment on the pleadings pursuant to 12(c). However Defendants also cite Rule 56(b) and because "matters outside the pleadings" have been presented to the Court, *see* FED. R. CIV. P. 12(b), 12(c), the Court will consider the motion as one for summary judgment.

U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The moving party bears the burden of informing this Court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to look beyond the pleadings and designate specific facts showing that a genuine issue exists for trial. FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53. It is not enough that the nonmoving party comes forward with the "mere existence of a scintilla of evidence . . . ," *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512, or some "metaphysical doubt as to the material facts." *Matsishita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Rather, the nonmoving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

**III. Applicable Law and Analysis**

A. Count I: Fraud/Conversion

Defendants contend that Plaintiff does not have any evidence of fraud. Fraud requires:

> (1) That the defendant made a material representation; (2) that it was false; (3) that when the defendant made it the defendant knew that it was false, or that the defendant made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that the defendant made it with the intention that it should be acted on by the plaintiff; (5) that the plaintiff acted in reliance on it; and (6) that the plaintiff thereby suffered injury.

*Hord v. Envtl. Research Inst. of Mich.*, 228 Mich. App. 638, 642, 579 N.W.2d 133, 135 (1998) (citing *Candler v. Heigho*, 208 Mich. 115, 121, 175 N.W. 141 (1919), *overruled in*

5

*part on other grounds by U.S. Fid. & Guar. Co. v. Black*, 412 Mich. 99, 120-21, 313 N.W.2d 77 (1981)).

Turning to the first element, the Court does not believe that Plaintiff can show that defendants "made a material representation." Here, Plaintiff contends that Gusmano offered Hurttgam $25.00 per 1,000 parts for Hurttgam to falsely represent to Kamax that CPH was sorting parts. However, Plaintiff has failed to point to any representation on the part of Hurttgam or CPH to anyone at Kamax. The record shows that Hurttgam only communicated with Gusmano and there is no evidence that he ever represented to her that he was actually sorting parts. In fact, according to Hurttgam:

> What I thought I was being paid for was the fact that I would have to hold liability or responsibility for that product going to Chrysler. So if they found a problem, I would get the phone call and I would have to go in there and rectify the issue, whether that means traveling out of the state or what have you, I would have to take it.

(Hurttgam Dep. at 64).

Therefore, because Plaintiffs cannot establish that Defendants made a representation to Kamax, Plaintiff's fraud claim must be dismissed.

B. Count II: RICO Violations

18 U.S.C. § 1964(c) permits a civil RICO suit where there has been "a violation of Section 1962." Section 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise . . . to conduct . . . such enterprise's affairs through a pattern of racketeering activity . . . ."

To establish a RICO claim, the plaintiff must prove: "1) that there were two or more predicate offenses; 2) that an 'enterprise' existed; 3) that there was a nexus between the

6

pattern of racketeering activity and the enterprise; and 4) that an injury to business or property occurred as a result of the above three factors." *VanDenBroeck v. CommonPoint Mortgage Co.*, 210 F.3d 696, 699 (6th Cir. 2000).

1. Predicate Offenses

First, Plaintiff contends that Defendants committed at least two acts of the following racketeering activities: mail fraud (18 U.S.C. § 1341), money laundering (18 U.S.C. § 1956), and engaging in monetary transactions in property derived from unlawful activities (18 U.S.C. § 1957).

A violation of the mail fraud statute may be established if the plaintiff can prove: (1) a scheme to defraud; and (2) use of the mails to execute this scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S. Ct. 358, 362 (1954); *see also United States v. Goodpaster*, 769 F.2d 374, 377 (6th Cir. 1985). In *Carpenter v. United States*, 484 U.S. 19, 108 S. Ct. 316 (1986), the Supreme Court described the elements of a scheme to defraud to include:

> [T]he words "to defraud" in the mail fraud statute have the "common understanding" of "wrongdoing one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." The concept of "fraud" includes the act of embezzlement, which is "the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another."

*Id.* at 27, 108 S. Ct. at 321 (citations omitted). Thus, a RICO action may be based on a predicate act of fraud broader than common law fraud.

In this case, Plaintiff has alleged the following scheme to defraud: Plaintiff contends that despite the fact that Hurttgam's other company, QualityMax, only charged $6.00 to $7.00 per 1,000 to actually sort parts, Gusmano offered Hurttgam $25.00 per 1,000 parts for

7

Hurttgam to do nothing. Gusmano, not Hurttgam, drew up CPH's invoices and submitted them to Kamax. Plaintiff contends that Kamax paid CPH and Hurttgam $268,021.77, believing that they had actually sorted the parts. Plaintiff also contends that Hurttgam gave Gusmano $139,000 as a "kickback" from their business transaction. In this Court's opinion, viewing the evidence in the light most favorable to Plaintiff, a genuine issue of fact remains as to whether Plaintiff has set forth a scheme to defraud.

Defendants contend that Plaintiff cannot show the use of the mail to establish mail fraud pursuant to 18 U.S.C. § 1341. However, Gusmano testified that she believes one check was mailed to Hurttgam. (Gusmano Dep. at 19). In addition, according to Plaintiff, a Kamax employee, Blodgett, "testified that he would not hold checks for more than a day, that Gusmano was away on business many times, and that therefore, following his established policy of not holding checks, at least several checks more likely than not ended up in the mail." (Br. in Supp. of Pl.'s Resp. to Defs.' Mot. at 12).[2] Thus, the Court believes that a genuine issue of material fact remains as to whether Plaintiff has shown use of the mail.

In addition, the Court believes that a genuine issue of material fact remains as to whether Defendants engaged in two or more predicate acts of money laundering. 18 U.S.C. § 1956 provides, in pertinent part:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity–

---

[2] Plaintiff has not provided the Court with Blodgett's deposition transcript or any additional information on Blodgett's position within Kamax.

8

* * *

(B) knowing that the transaction is designed in whole or in part–

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; . . .

18 U.S.C. § 1956(a)(1)(B)(i).

Plaintiff contends that in at least eight instances Hurttgam attempted to launder money by writing personal checks to "cash," and then, in turn, writing cashiers checks to Gusmano, rather than simply writing the check to Gusmano, in an effort to conceal the kickbacks. (*See* Gusmano Dep. Exs. 12 & 13).

Finally, Defendants contend that Plaintiff has failed to show that Defendants participated in a financial transaction with "criminally derived property of a value of greater than $10,000 and is derived from specified unlawful activity" as "specified unlawful activity is defined in section 1956. Plaintiff alleges that the amount of criminally derived property is $268,021.77. The Court is satisfied that a genuine issue of material fact exists as to whether Defendants participated in a financial transaction with criminally deprived property of a value greater than $10,000 and is derived from specified unlawful activity.

2. Existence of an "Enterprise"

To establish a RICO claim, Plaintiff must show that an enterprise existed. The statutory language defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An "'enterprise' is not the 'pattern of racketeering

9

activity;' it is an entity separate and apart from the pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 2529 (1981).  This Circuit has stated that an association-in-fact may be shown by "an ongoing organization" and "its members must function as a continuing unit, and must be separate from the pattern of racketeering activity in which it engages."  *Frank v. D'Ambosi*, 4 F.3d 1378, 1386 (6th Cir. 1993) (citation omitted).

In *VanDenBroeck v. CommonPoint Mortgage Co.*, 210 F.3d 696 (6th Cir. 2000), borrowers brought a class action under RICO against a lender challenging the reasonableness of the lender's undisclosed fees.  The defendant obtained the borrower, made the loan to the borrower at a different rate based upon the secondary lender's proposed rate of interest, before selling the loan to the secondary lender and collecting a fee.  *Id.* at 699-700.  The district court determined that the absence of a discrete number of lenders meant "that this conspiracy could have transpired with any lender in the secondary lending market."  *Id.* at 700.  Based upon these allegations, the relationship between the defendant and lenders demonstrated nothing more than a business relationship which failed to meet the enterprise requirement that the enterprise functioned as a continuous unit.  *Id.*

Dismissal of a RICO complaint was likewise affirmed where the complaint essentially listed a string of entities allegedly comprising the enterprise and then listed a string of supposed racketeering activities but made no factual allegations suggesting the behavior of those entities was coordinated such that they functioned as a continuing unit.  *Begala v. PNC Bank, Ohio, Nat'l Assoc.*, 214 F.3d 776, 781 (6th Cir. 2000).  "A properly pled RICO claim must cogently allege activity 'that would show ongoing, coordinated behavior among

10

defendants that would constitute an association-in-fact.'" *Id.* (quoting *Frank*, 4 F.3d at 1386).

In this case, Plaintiff contends that the pattern of racketeering activity involved Hurttgam, CPH and Gusmano. Plaintiff alleges the following "enterprise": Hurttgam, CPH and Gusmano used Kamax to commit the illegal acts set out above. (Compl. at ¶ 21). Here, the Court believes that a genuine issue of fact remains as to whether CPH, Hurttgam, Gusmano, and Kamax were an association-in-fact enterprise, separate from the pattern of racketeering activity.

3. Nexus

Plaintiff must also prove that there was a nexus between the pattern of racketeering activity and the enterprise. The requirement of a "pattern of racketeering activity" mandates "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). The prerequisite of two predicate acts is a minimum requirement; a pair of predicate acts does not necessarily establish a "pattern." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237-38, 109 S. Ct. 2893, 2899-2900 (1989). Moreover, the predicate acts must bear some relation to each other:

> In normal usage, the word "pattern" here would be taken to require more than just a multiplicity of racketeering predicates. A "pattern" is an "arrangement or order of things or activity," and the mere fact that there are a number of predicates but the relationship that they bear to each other or to some external organizing principle renders them "ordered" or "arranged."

*Id.* at 238, 109 S. Ct. at 2900. There must be two or more acts that have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events" as part of a

11

continuing pattern. *Id.* at 240, 109 S. Ct. at 2901.

In this case, Plaintiff contends that the alleged acts of mail fraud, money laundering, and engaging in monetary transactions in criminally derived property occurred from September 2002 through October 2003. Plaintiff further alleges that these acts were part of a scheme to pay Hurttgam and CPH based on fraudulent invoices and then kickback approximately half of the money to Gusmano using Kamax to commit these acts. Consequently, the Court believes that a genuine issue of fact remains as to whether there was a nexus between the alleged pattern of racketeering activity and the alleged enterprise.

4. Injury

Defendants contend that Plaintiff has failed to prove an injury to the business because Daimler Chrysler never found a defect in any of the parts "validated" by CPH. Plaintiff counters that Kamax paid Hurttgam over $268,000 and received nothing of value. Therefore, there is a genuine issue of fact as to whether Kamax suffered an injury.

C. Count III: Constructive Trust

"Constructive trusts are creatures of equity and their imposition makes the holder of the legal title the trustee for the benefit of another, who in good conscience is entitled to beneficial interest." *Arndy v. Vos*, 83 Mich. App. 484, 487, 268 N.W.2d 693, 694 (1978). "Constructive trusts, while infinite in their variety, are imposed only where it would be inequitable to do otherwise." *Id.* A constructive trust is an appropriate remedy to prevent unjust enrichment of one who unlawfully deprives another of his property interest. *Id.* at 517; *see also Mich. Nat'l Bank Ass'n v. William Kahlich, Inc.*, 23 Mich. App. 483, 487, 179

N.W.2d 29, 31 (1970).

In this case, Plaintiff claims that CHP and Hurttgam received over $268,000 for doing nothing and then they gave Gusmano over half of the money, $139,000, as a kickback. In contrast, Defendants contends that CHP and Hurttgam received $25 per 1,000 parts for assuming liability if any of the parts were found to be defective and that the $139,000 was an interest-free loan. Consequently, the Court does not believe that either party is entitled to summary judgment on Count III.

    D. <u>Plaintiff's Motion for Partial Summary Judgment</u>

Alternatively, Plaintiff argues that the Court should enter partial summary judgment on Count III in the amount of $168,995.00, representing the amount that CPH over-billed Kamax. It is undisputed that Kamax only manufactured approximately 5,000,000 parts during the relevant time period, and that Kamax was billed for approximately 12,500,000 parts. (*See* Pl.'s Mot. Ex. 3, Gusmano's reply to Kamax accountant's inquiries at ¶ 10). Plaintiff contends that CPH and Hurttgam were never exposed to any liability for 7,500,000 parts because the parts were never manufactured, never shipped, and therefore, they never could have turned out to be defective.

Defendants argue that because the "over-billings" were not pleaded in Plaintiff's complaint, Plaintiff has no standing to plead any such claim. According to Defendants, Exhibit 3 was not provided to them until March 16, 2005 at Gusmano's deposition.

Plaintiff contends, however, that at the time of the filing of the complaint, Plaintiff had no way of knowing that Hurttgam would take the position that his deal with Gusmano was supported by consideration, i.e., assuming liability if any of the parts were defective.

13

Moreover, even if the over-billings issue should have been pleaded, Plaintiff contends that Defendants have not established that they suffered any prejudice. The Court agrees with Defendants that the allegations in Plaintiff's present complaint do not entitle Plaintiff to the relief it seeks, i.e., a partial summary judgment on its theory of constructive trust. However, because Defendants are on notice of this claim, the Court believes that it would be in the best interests of justice to permit Plaintiff to amend its complaint, if it desires, to properly plead a claim for constructive trust that it believes would permit it to seek partial summary judgment. If Plaintiff chooses to file such an amended complaint, the amended complaint shall be filed within 14 days of the date of this Opinion.

An Order consistent with this Opinion shall issue forthwith.

DATE: JUNE 30, 2005

                                      S/PATRICK J. DUGGAN
                                      PATRICK J. DUGGAN
                                      UNITED STATES DISTRICT JUDGE

Copies to:
Hans H. J. Pijls, Esq.
Otis M. Underwood, Jr., Esq.
Paul Moceri, Esq.